MATTER OF Z——

## In DEPORTATION Proceedings

## A-4420140

*Decided by Board October 28, 1958*

Crime involving moral turpitude—Section 241(a)(4) of the 1952 act—"Single scheme" not established where crimes violating identical statute were separate episodes in continuing criminal plan.

Single-scheme of criminal misconduct within meaning of section 241(a)(4) of the 1952 act is not established where respondent has been convicted on two counts of an indictment for defrauding the Government of tax on two separate occasions with respect to separate quantities of alcohol in violation of 26 U.S.C. 3321. Convictions which are the result of separate episodes are not part of "single scheme" even though the episodes occur pursuant to a continuing criminal plan or conspiracy. (See note at end of decision.)

CHARGE:

Order: Act of 1952—Section 241(a)(4) [8 U.S.C. 1251(a)(4)]—Convicted of two crimes involving moral turpitude: Intent to defraud the United States of tax (two offenses).

### BEFORE THE BOARD

**Discussion:** This is an appeal from the order of the special inquiry officer finding the respondent deportable on the ground stated above and denying his application for discretionary relief. The appeal will be dismissed.

Respondent, a 56-year-old married male, a native and citizen of Italy, last entered the United States in 1922. His deportation is sought on the ground that after entry he has been convicted of 2 crimes involving moral turpitude "not arising out of a single scheme of criminal misconduct." The issue is whether the crimes for which he has been convicted arose out of a single scheme of criminal misconduct.[1] On March 25, 1941, respondent was convicted, upon a plea of guilty, on 11 counts of an indictment charging violation of several provisions of the Internal Revenue laws, and on one count charging conspiracy to violate provisions of the Internal

[1] Section 241(a)(4) [8 U.S.C. 1251(a)(4)] provides in pertinent part: "Any alien in the United States * * * shall, upon the order of the Attorney General, be deported who * * * at any time after entry is convicted of two crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial."

Revenue laws. He was sentenced to imprisonment for a term of 8 years and fined $12,000. The Services relies upon the convictions based on counts 6 and 11. Count 6 charges that respondent and others removed 200 gallons of alcohol with intent to defraud the Government of tax on September 18, 1940, in the County of Sangamon in violation of 26 U.S.C. 3321, 1940 ed. Count 11 charges that on September 9, 1940, the respondent and others committed the same act in the same county with the same intent in violation of the same law in connection with 50 gallons of alcohol. Count 12, the conspiracy count of the indictment, charged that from April 1938 to the date of the presentment (September 1941) respondent combined with others to commit the offenses described in the other 11 counts of the indictment and conspired to commit other like offenses the number of which was unknown. All the allegations concerning the other counts of the indictment were incorporated by reference into the conspiracy count.

The special inquiry officer found that although the respondent had entered into a general conspiracy with others to commit the offenses charged in counts 6 and 11, the offense in each of those counts was a complete, individual, and distinct crime and was not a part of a single scheme of criminal misconduct. Counsel contends that the offenses in counts 6 and 11 were committed in pursuance of the conspiracy and, therefore, are part of a single scheme of criminal misconduct. The case most pertinent of those upon which he relies is *Jeronimo* v. *Murff*, 157 F. Supp. 808 (S.D. N.Y., 1957). The special inquiry officer dismissed *Jeronimo* from consideration on the ground that it was decided by a district court in a circuit other than that which would have jurisdiction of the respondent's case. The Service representative reinforced the position of the special inquiry officer but also attempted to distinguish and explain *Jeronimo*.[2] Without implying that there is only one answer to the

[2] The Service representative argues that *Jeronimo* does not stand for the proposition that unlawful acts performed during the existence of a conspiracy are necessarily committed as part of a single scheme. He believes that in *Jeronimo*, the existence of a single scheme was found, not because a conspiracy existed but because the court found that all of Jeronimo's acts were directed to a single end. In the instant case, he points out, the indictment reveals that respondent conspired to commit "divers" offenses. He stated that this indicates that the grand jury "apparently considered that the respondent and others had conspired to commit several crimes which would differ in character and quality, and not of the same kind." The Service representative also points out that the conviction on the conspiracy could have been brought about by proof of the agreement and the existence of any one of the 20 overt steps set out. (All but one of the overt acts refer to a date other than September 18 or September 9, 1940, when the acts mentioned in counts 6 and 11 were committed. The relation of the overt acts of September 18 and September 9, if any, to the acts set forth in counts 6 and 11 is not known.) The Service representative also relies upon the "very peculiar and very unusual facts" of *Jeronimo*.

171

question, and whether or not the instant case can be distinguished from *Jeronimo*, we prefer to base our decision primarily on the belief that *Jeronimo* does not set forth the proper rule.

Jeronimo had been ordered deported on the ground that he was a twice-convicted alien. The Court found this to be error. Jeronimo plotted with others to defraud the City of New York by submitting fraudulent claims for payments in connection with painting done for the City of New York on contracts which appear to have been awarded to him from time to time. He was indicted under an eight-count indictment charging bribery, grand larceny, and conspiracy. He was convicted on the conspiracy count, 4 larceny counts and a bribery count. Each of the larceny counts concerned separate contracts and different properties. All of the contracts were with the City of New York. The Service relied upon the 4 larceny convictions for the deportation proceedings. The conspiracy count charged the existence of a conspiracy from about March 1947 continuously to about January 1949. Nine overt acts in furtherance of the conspiracy were set forth in the count. The remaining counts charged grand larceny or bribery. One or more of the overt acts set forth in the conspiracy count formed the bases for the other counts. One larceny count covered the period from April 1947 to October 15'8. It involved an aggregate amount of over $39,000; it is based on two of the overt acts described in the conspiracy count. One larceny count covered the period from January 1948 to September 1948. It involved an aggregate amount of over $43,000; it is based upon two of the overt acts described in the conspiracy count. One larceny count covered the period from about June 1948 to about December 1948. It involved an aggregate amount of over $52,000; it is based on three overt acts described in the conspiracy count. One larceny count covered the period from October 1948 to January 1949. It involved an aggregate amount of over $50,000; it is based on two of the overt acts described in the conspiracy count. The concluding paragraph of the indictment stated that "All of the acts and transactions alleged in each of the several counts in this indictment are connected together and constitute parts of a common scheme and plan." ·

In *Jeronimo* the Government argued that separate crimes do not arise out of a single scheme of criminal misconduct unless the crimes were committed pursuant to a single sustained criminal impulse and that since Jeronimo's larcenies were the result of separate independent impulses, his crimes did not arise out of a single scheme of criminal misconduct. The Court rules that the existence of the same criminal impulse was not an indispensible prerequisite to proof of a single scheme. In finding the existence of a single scheme in *Jeronimo*, the Court stated:

The evidence in the record conclusively establishes that the four larcenies upon which the proposed deportation is based arose out of a single continuing criminal enterprise. (p. 818)

* * * The initial formulation of the same subsisting fundamental object and purpose; the utilization of precisely the same methods and procedures in each of a series of successive situations to accomplish the original objective; the continuously interacting relationship and activities of the same persons who originated and launched the project; the victimizing of the same person through all the acts—such evidentiary facts may, in the aggregate, demonstrate the existence of a single criminal enterprise, project and undertaking. Such is the case at bar. (p. 815)

*Jeronimo* appears to prevent the use of convictions arising out of "a single continuing criminal enterprise," without regard to the time which has elapsed between the criminal acts. In view of the broad coverage which Congress desired to give the provisions for the deportation of the criminal classes and in view of the illogical situation which results from the interpretation, we do not believe *Jeronimo* can be followed.

Congress intended to make the law relating to the deportation of the criminal aliens broad. The grounds for the deportation of the criminal were made retroactive in effect and were applicable to the criminal alien despite the facts that he had previously been in the United States legally and his acts occurred prior to the enactment of the Immigration and Nationality Act.[3] The fact that the alien had been made deportable did not mean that he must of necessity be deported for provision was made for the suspension of his deportation in the discretion of the administrative authorities and Congress. Obviously, it was the intent of Congress to bring under review the desirability of continued residence in the United States of persons who had been convicted of crimes involving moral turpitude. The law should not be interpreted in such a manner as to remove a substantial segment of criminal aliens from such review.

*Jeronimo* would remove from liability to deportation the alien who, by carrying on his crimes over a period of years, revealed that he was confirmed in his criminality. This interpretation can hardly be in accord with the intent of Congress to make deportable aliens who were convicted twice whether or not they were confirmed

---

[3] "* * *, the instant bill [H.R. 5678] makes the following basic and significant changes: * * * 5. Broadens the grounds for exclusion and deportation of criminal aliens * * *." (H.R. 1365, February 14, 1952, 82d Cong., 2d sess., U.S. Code Congressional and Administrative News, Vol. 2, 1952, p. 1679) ; "This class of deportable aliens [aliens in section 241(a)(4)] has been modified to facilitate the deportation of undesirable criminal aliens. Thus, an alien who at any time after entry is convicted of two crimes involving moral turpitude is deportable, regardless of whether confined therefor, whereas under existing law the alien must have been sentenced to a term of a year or more because of such convictions * * *" (S.R. 1137, 82d Cong., 2d sess., p. 21; see paragraph entitled "Stricter Construction," p. 61, 8 U.S.C.A.; *Lehmann* v. *United States ex rel. Carson*, 353 U.S. 685).

173

criminals. A brief bit of history will be helpful at this time. The law previous to the section in question was interpreted as requiring the deportation of the twice-convicted alien who after entry had shown himself to be a criminal of a "confirmed" type.[4] Since the "repeater" is the plainest confirmed type, the Supreme Court held that Congress intended to deport the twice-convicted alien only if the alien after conviction and incarceration once again committed a crime involving moral turpitude and was again convicted and incarcerated.[5] The changes brought about by the Act of 1952 show that Congress wished to make liable to deportation not only the *confirmed* criminal but also any alien who committed two crimes after entry, so long as the crimes did not arise out of a single scheme of criminal misconduct. Thus, Congress eliminated the requirement that the twice-convicted alien had to be sentenced to imprisonment for a year or more; it eliminated the requirement that the alien had to be confined; and it eliminated the requirement that the second conviction had to follow a confinement. As we have previously mentioned, it made the law retroactive. In view of this attempt to subject the twice-convicted alien to deportation whether or not he was a confirmed criminal, it would appear contrary to the intent of Congress to so interpret the law as to permit the one whose violation of law may extend over a long period of time and who may have engaged in a series of criminal acts, to escape from liability to deportation merely because he had dedicated himself in advance to a course of certain criminal conduct with others against the same victim. Especially difficult is it to accept this exemption when it is considered that a conspiracy is an offense of the "gravest character, sometimes quite outweighing in injury to the public, the mere commission of the contemplated crime." [6]

If Jeronimo had not been charged with conspiracy, but merely with the substantive crimes, would he have been deportable as a twice-convicted alien? We have set forth the test announced by the Court concerning the manner in which evidentiary facts may establish the existence of a single scheme. Under this test, it is possible to argue very convincingly that the Court would have been able to reach the same result it did. *Jeronimo* will make most difficult the application of the immigration laws to the twice-convicted alien who has committed similar offenses against the same victim.

Let us consider the incongruous situation which arises if the section is interpreted to exclude from liability to deportation the alien who committed his crimes in the course of a conspiracy or as

[4] Section 19(a), Act of February 5, 1917 (39 Stat. 874).

[5] *Fong Haw Tan* v. *Phelan*, 333 U.S. 6.

[6] *United States* v. *Rabinowich*, 238 U.S. 78; *United States* v. *Lancaster*, 44 Fed. 896 (C.C. Ga., 1891).

174

a result of an intent to victimize the same individual. Alien 1, a young man falling in with evil companions, robs B and five minutes later robs C. He is apprehended and convicted of both robberies. He never again becomes involved with the law. Alien 2, alone or in conspiracy with others, carries on a scheme to defraud or rob the same victim over a period of many years. Many criminal acts are committed. Alien 1 is subject to deportation. Under *Jeronimo*, alien 2, a confirmed criminal, is free from liability to deportation. Congress could not have intended such an illogical result.

It is true that where language in a deportation statute is susceptible to more than one interpretation, that most favorable to the alien should be taken. However, such a rule should not apply where the favorable rule prevents a reasonable interpretation of the statute in the light of the general scheme, while the strict view permits the general scheme to be effectuated. The statute should be interpreted to include the greatest number of twice-convicted aliens. This can be done, and the clause in question can at the same time be given effect by exempting the twice-convicted criminal whose acts are essentially one act. We believe that this test has been the basis of administrative and judicial rulings holding that a single scheme existed. Thus, the following have been held to be single schemes: Convictions based upon the same act (counterfeiting and possession of counterfeit money); convictions based upon an aggregate of acts occurring at the same time (convictions for indecent fondling of two minors in the same room at the same time); convictions based upon closely connected acts performed at about the same time to bring to fruition some immediate criminal purpose (breaking and entry of a bank and assault upon a bank watchman).

We do not think it unreasonable to limit the exemption from deportation to the categories we have stated (and such other related ones as the future may develop) in view of the desire of Congress to extend its control over the criminal alien. This interpretation is logical to the extent that it makes the intrinsic nature of the criminal conduct the test rather than the manner in which an indictment may be drawn up or the fact that the alien confined his acts to one victim pursuant to a preconceived plan.

It seems to us that certainty and consistency require that interpretations of the phrase "single scheme" be based upon some common ground. There is a common ground in decisions which find a single scheme in acts which constitute but one criminal episode. The cases except for *Jeronimo* have refused to find the existence of a "single scheme" unless one act was involved, or those which were done were so related in time and purpose as in reality to constitute but one separate episode. The fact that different victims were in-

175

volved or that the episode was but part of a continuing plan which resulted in the birth of other episodes was not considered material. There is no common ground between these cases and one which considers as part of a single scheme the many episodes which are the result of a continuing agreement to engage in many episodes. This, we think, weakens the cogency of the decision in *Jeronimo*, for there should be a pattern; if *Jeronimo* does not fit into the pattern which it is agreed must result in a single scheme, then *Jeronimo* does not state a correct rule of law.

We conclude that this record establishes the existence of two independent criminal acts so separated by time that they constitute individual episodes and so do not constitute a single scheme of criminal misconduct. Deportability is established.

The respondent has applied for preexamination or suspension of deportation under section 244(a) of the Immigration and Nationality Act (8 U.S.C. 1254(a)). Respondent's age, his length of residence in the United States, the fact that his wife is a native-born United States citizen whom he married in 1935, and the presence of siblings in the United States, make it proper to find that his deportation would result in hardship required to qualify for suspension of deportation. However, we believe that his applications should be denied. This is for the reasons given by the special inquiry officer and because the record creates a substantial doubt as to whether the respondent has been candid with the Government concerning his financial ability to pay his indebtedness to the Government, and his participation in gambling activities; and because this very lack of candor prevents him from bearing his burden of establishing that he merits discretionary relief. The full facts concerning discretionary relief have been set forth by the special inquiry officer and it is unnecessary to repeat them. In reaching our conclusion we have carefully considered the entire record, including the brief submitted on appeal, the affidavits of record and the oral argument of counsel, including his statement that respondent's difficulty arises out of his inability to express himself. No change should be made in the order of the special inquiry officer.

**Order:** It is ordered that the appeal be and the same is hereby dismissed.

*Editor's Note:* Motion for summary judgment was filed with the United States District Court for the Northern District of Illinois, by the subject alien on January 22, 1959. In a memorandum decision rendered by the Court on March 31, 1959, in the subject action, *Zito* v. *Moutal*, 174 F. Supp. 531, motion for summary judgment was granted and the outstanding order of deportation in the case was declared null and void as not deemed to be based on sufficient evidence.