**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ISTVAN SZONYI, *Petitioner*, v. MATTHEW G. WHITAKER, Acting Attorney General, *Respondent*. | No. 15-73514 Agency No. A010-977-327 OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted October 10, 2018
Portland, Oregon

Filed February 13, 2019

Before: Raymond C. Fisher, Richard R. Clifton,
and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Clifton;
Dissent by Judge Fisher

**SUMMARY***

---

### Immigration

Denying Istvan Szonyi's petition for review of a decision of the Board of Immigration Appeals, the panel upheld the BIA's interpretation of the phrase, "single scheme of criminal misconduct," which operates as an exception to the ground of removal, under 8 U.S.C. § 1227(a)(2)(A)(ii), for a person who has been convicted of "two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct."

In *Matter of Adetiba*, 20 I. & N. Dec. 506 (BIA 1992), the BIA affirmed the following interpretation of the phrase "single scheme of criminal misconduct": "when an alien has performed an act, which, in and of itself, constitutes a complete, individual, and distinct crime, he is deportable when he again commits such an act, even though one may closely follow the other, be similar in character, and even be part of an overall plan of criminal misconduct." The BIA said that it would apply this interpretation in all circuits except those that had adopted more expansive interpretations. That exception applied to this circuit, whose previous interpretation of the phrase encompassed distinct crimes that were part of the same overall plan. However, in *Matter of Islam*, 25 I. & N. Dec. 637 (BIA 2011), the BIA announced that it would apply the interpretation from *Matter of Adetiba* in all circuits.

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Szonyi, a lawful permanent resident, forced three women to commit sexual acts under threat of violence over a five- to six-hour period. For those acts, Szonyi pled guilty to two counts of oral copulation in violation of California Penal Code § 288a(c) and two counts of sexual penetration with a foreign object in violation of California Penal Code § 289. Based on these offenses, the BIA ultimately concluded that Szonyi was removable because his crimes did not arise out of a single scheme under BIA precedent.

The panel rejected Szonyi's argument that this court's precedent forecloses the BIA's interpretation of the phrase "single scheme of criminal misconduct," upholding the BIA's interpretation under principles of deference under *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837 (1984). As a preliminary matter, the panel concluded that, because the BIA's position appeared to be set based on its opinion in *Matter of Islam* at the time of Szonyi's proceedings, Szonyi did not have to exhaust his challenge to the BIA's interpretation.

Observing that, under *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005), the court does not defer, under *Chevron*, where a prior court decision holds that its construction follows from the unambiguous terms of the statute, the panel concluded that no circuit precedent held that the text of the statute unambiguously foreclosed the BIA's interpretation here. The panel also rejected Szonyi's contentions that the BIA's interpretation was impermissible based on congressional intent and constitutional avoidance. With respect to the latter issue, the panel explained that the Supreme Court's recent vagueness jurisprudence is distinguishable from the present case.

The panel also rejected Szonyi's argument that, even if the BIA's construction of the statute was permissible, the agency could not retroactively apply that standard to this case. Analyzing the relevant factors set out by *Montgomery Ward & Co. v. FTC*, 691 F.2d 1322 (9th Cir. 1982), the panel concluded that, on balance, the retroactive application of the BIA's interpretation was not improper. The panel further rejected Szonyi's argument that, even under BIA precedent he was not removable, concluding that the BIA's analysis was consistent with its precedent.

Finally, the panel upheld the agency's denial of discretionary relief, rejecting Szonyi's contention that the BIA failed to consider all favorable and unfavorable factors bearing on his eligibility.

Dissenting, Judge Fisher disagreed with the majority's conclusion that the BIA reasonably applied its precedent to this case. Judge Fisher wrote that BIA precedent squarely holds that two or more crimes committed during a single criminal episode arise from a single scheme of criminal conduct unless they are marked by a "substantial interruption that would allow the participant to disassociate himself from his enterprise and reflect on what he has done" between crimes. Judge Fisher would grant the petition for review and remand to the BIA for an adequate explanation because it cannot be discerned from the record whether or how the BIA applied this precedent in this case, where the petitioner's crimes were part of a single and continuous criminal episode, and there was nothing in the record to suggest there was a "substantial interruption" between the crimes.

**COUNSEL**

David Timothy Raimer (argued), Jones Day, Washington, D.C.; Meir Feder, Jones Day, New York, New York; for Petitioner.

Leslie McKay (argued), Senior Litigation Counsel; Terri J. Scadron, Assistant Director; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

Jennifer Lee Koh and Andrew Michael Knapp, Western State College of Law, Irvine, California, for Amicus Curiae American Immigration Lawyers Association.

---

**OPINION**

CLIFTON, Circuit Judge:

Istvan Szonyi petitions for review of a decision by the Board of Immigration Appeals ("BIA") upholding a final order of removal against him. This case presents the question of whether the BIA permissibly interpreted the phrase "single scheme of criminal misconduct" under 8 U.S.C. § 1227(a)(2)(A)(ii). In that statute, the phrase operates as an exception to a ground for removal. Specifically, the statute provides that a person is deportable if he has been convicted of "two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct." We previously adopted a different, broader interpretation of the phrase in *Wood v. Hoy*, 266 F.2d 825 (9th Cir. 1959), an interpretation we reaffirmed in *Gonzalez-Sandoval v. INS*, 910 F.2d 614 (9th Cir. 1990), and *Leon-Hernandez v. INS*,

926 F.2d 902 (9th Cir. 1991). Because the phrase in question operates as an exception to a ground for deportation, the BIA's narrower definition of the exception serves to broaden the application of the removal provision, making Szonyi subject to removal when he might not have been under our previous definition.

We uphold the BIA's interpretation under the principles of *Chevron* deference that apply when the BIA interprets immigration laws. *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). We also conclude that the BIA properly applied this interpretation here, and that this application was not impermissibly retroactive. In addition, we uphold the BIA's denial of discretionary relief, acknowledging the limitations on judicial review of discretionary decisions. *See* 8 U.S.C. § 1252(a)(2)(B)(i). Accordingly, we deny Szonyi's petition for review.

## I.   Background

Szonyi is a citizen of Hungary who was admitted to the United States as a lawful permanent resident in 1957, when he was four years old. In 1981, after a day of heavy drinking, he forced three women to commit sexual acts under threat of violence over a five- to six-hour period. For those acts, Szonyi pled guilty to two counts of oral copulation in violation of California Penal Code § 288a(c) and two counts of sexual penetration with a foreign object in violation of California Penal Code § 289. Based on these offenses, the government commenced removal proceedings against Szonyi in 2005, eventually charging him as removable because he had been convicted of "two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct" under 8 U.S.C. § 1227(a)(2)(A)(ii).

The immigration judge ("IJ") sustained that charge. In a written order filed on September 19, 2011, the IJ found Szonyi removable because his predicate crimes involved moral turpitude and did not arise out of a single scheme of criminal misconduct under Ninth Circuit precedent. The IJ also determined that the positive equities in Szonyi's case did not offset his adverse criminal history and therefore denied his request for a waiver of inadmissibility and cancellation of removal. The IJ ordered Szonyi's removal to Hungary, and Szonyi timely appealed to the BIA.

While Szonyi's appeal was pending, the BIA issued a precedential opinion in *Matter of Islam*, 25 I. & N. Dec. 637 (BIA 2011), which announced that the BIA would apply its preferred interpretation of "single scheme of criminal misconduct" in all circuits, including those that had previously interpreted that phrase more expansively. *Id*. at 641. In light of *Matter of Islam*, the BIA remanded Szonyi's appeal to the IJ for analysis under the BIA's "single scheme" jurisprudence.

On remand, the IJ again found Szonyi removable because his crimes did not arise out of a single scheme under BIA precedent. The IJ also incorporated by reference her earlier decision (1) finding Szonyi removable under the Ninth Circuit's standard and (2) denying discretionary relief. The BIA affirmed, finding Szonyi removable under the BIA's interpretation of the single scheme exception. The BIA also agreed with the IJ that Szonyi did not merit discretionary relief.

Szonyi filed a timely petition for review.

## II.  Removability

Szonyi challenges the BIA's conclusion that he is removable because he has been convicted of "two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct." 8 U.S.C. § 1227(a)(2)(A)(ii). Szonyi argues that (1) the BIA's interpretation of the Immigration and Nationality Act ("INA") is foreclosed by Ninth Circuit precedent; (2) the BIA's interpretation is unreasonable; (3) even if the BIA's interpretation is permissible, it cannot be applied to him retroactively; and (4) even if the BIA's interpretation is permissible, the BIA misapplied that interpretation to the facts of his case. We are not persuaded by any of these arguments.

### 1.  BIA Interpretation of "Single Scheme of Criminal Misconduct"

In *Matter of Adetiba*, 20 I. & N. Dec. 506 (BIA 1992), the BIA affirmed its longstanding interpretation of "single scheme of criminal misconduct" under § 1227(a)(2)(A)(ii), which it said would apply in all circuits except those that had adopted their own more expansive interpretation of the term. *Id.* at 510. The BIA's interpretation was that:

> when an alien has performed an act, which, in and of itself, constitutes a complete, individual, and distinct crime, he is deportable when he again commits such an act, even though one may closely follow the other, be similar in character, and even be part of an overall plan of criminal misconduct.

*Id.* at 509. As noted above, the BIA later announced it would apply the *Adetiba* standard uniformly across all circuits in *Matter of Islam*, 25 I. & N. Dec. at 641. Szonyi argues that Ninth Circuit precedent forecloses the BIA's interpretation.

As a preliminary matter, the government argues that this court lacks jurisdiction to consider the permissibility of the BIA's interpretation because Szonyi failed to exhaust this argument before the BIA. A petitioner's failure to raise an argument before the BIA generally constitutes a failure to exhaust, thus depriving this court of jurisdiction to consider the issue. *See Barron v. Ashcroft*, 358 F.3d 674, 677–78 (9th Cir. 2004). However, "[s]ome issues may be so entirely foreclosed by prior BIA case law that no remedies are 'available … as of right' with regard to them before IJs and the BIA." *Sun v. Ashcroft*, 370 F.3d 932, 942 (9th Cir. 2004). Where the agency's position "appears already set" and recourse to administrative remedies is "very likely" futile, exhaustion is not required. *El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review*, 959 F.2d 742, 747 (9th Cir. 1991). Because the BIA's position appeared set based on its precedential opinion in *Matter of Islam*, 25 I. & N. Dec. 637, Szonyi did not have to exhaust his challenge to the BIA's interpretation, and we have jurisdiction to review his claim.

We review legal questions de novo. *Chavez-Garcia v. Sessions*, 871 F.3d 991, 995 (9th Cir. 2017). When considering the BIA's interpretation of the INA as set forth in a published BIA opinion, we follow the two-step *Chevron* framework. *Valenzuela Gallardo v. Lynch*, 818 F.3d 808, 815 (9th Cir. 2016).

Under *Chevron*, we first ask "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842. If Congress has done so, the court "must give effect to the unambiguously expressed intent of Congress." *Id.* at 843. If Congress has not specifically addressed the question, the court must defer to the agency's interpretation if it is "based on a permissible construction of the statute." *Id.* This is true even if there is contrary circuit precedent, unless "the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005). Although this circuit previously interpreted "single scheme" more broadly than the BIA, no circuit precedent forecloses the BIA's interpretation.

Szonyi argues that this court concluded in *Wood*, 266 F.2d 825, that the BIA's interpretation is incompatible with the language of the statute. In *Wood*, we rejected the BIA's interpretation as "not what the statute says" because the BIA "applied the statute as if it read 'single criminal act'" rather than "single scheme of criminal misconduct." 266 F.2d at 830. Our decision also noted, however, that the INA did not itself define the term, and that the legislative history did not shed any light on Congress's intent in drafting the provision. *Id.* at 828–29. We therefore interpreted the phrase for ourselves.

Subsequent cases have interpreted *Wood* as establishing this circuit's precedent that:

> where credible, uncontradicted evidence,
> which is consistent with the circumstances of
> the crimes, shows that the two predicate

crimes were planned at the same time and executed in accordance with that plan, we must hold that the government has failed in its burden to establish that the conviction did not arise out of "a single scheme of criminal misconduct" within the meaning of [the INA].

*Gonzalez-Sandoval*, 910 F.2d at 616. Thus, in contrast to the BIA's approach, our previous interpretation of "single scheme of criminal misconduct" encompassed distinct crimes that were part of the same overall plan.

*Wood* was decided before *Chevron*, so we did not in that decision have reason to apply the *Chevron* framework and did not specifically comment on the ambiguity of the statutory text under *Chevron* step one. We did not say, though, that our interpretation "follow[ed] from the unambiguous terms of the statute," which would foreclose the agency's approach under *Brand X*, 545 U.S. at 982. *See Wood*, 266 F.2d at 828–29. The *Wood* decision likewise did not directly address the reasonableness of the BIA's approach under *Chevron* step two other than to reject it in favor of our court's own interpretation. *Id.* at 830. Our rationale for the conclusion was our own interpretation of the text, the absence of useful legislative history, and resolution of any interpretive doubt in favor of the alien where deportation might result. *Id.*

Szonyi also cites two post-*Chevron* cases that reaffirmed *Wood*'s interpretation of "single scheme," but neither case considered the permissibility of the BIA's interpretation. In *Gonzalez-Sandoval*, we reversed a BIA decision that relied on the First Circuit's standard rather than the *Wood* standard in interpreting "single scheme." 910 F.2d at 615. In *Leon-Hernandez*, we mentioned the standards from *Wood* and

*Gonzalez-Sandoval* in affirming the BIA's decision without mentioning any different BIA standard. 926 F.2d at 905. In sum, contrary to Szonyi's argument, there is no circuit precedent holding that the text of the statute unambiguously forecloses the BIA interpretation.

Our decision here is consistent with the decisions of other circuits that have considered the BIA's interpretation after *Chevron*. *See, e.g.*, *Balogun v. INS*, 31 F.3d 8 (1st Cir. 1994); *Chavez-Alvarez v. Attorney Gen. United States*, 850 F.3d 583 (3d Cir. 2017); *Akindemowo v. INS*, 61 F.3d 282 (4th Cir. 1995); *Iredia v. INS*, 981 F.2d 847 (5th Cir. 1993); *Abdelqadar v. Gonzales*, 413 F.3d 668 (7th Cir. 2005); *Nguyen v. INS*, 991 F.2d 621 (10th Cir. 1993).

The Fourth Circuit noted in 1995, when it accepted the BIA's interpretation, that at the time only the Second, Third, and Ninth Circuits did not follow the BIA's interpretation. *Akindemowo*, 61 F.3d at 286. In 2000, the Second Circuit called into question its contrary pre-*Chevron* interpretation and effectively appeared to join the circuits following the BIA's interpretation in *Michel v. INS*, 206 F.3d 253 (2d Cir. 2000). The majority in *Michel* concluded that it did not need to decide whether the BIA's "single scheme" interpretation was reasonable under *Chevron*, but it specifically noted that the precedent in which it had stated its different interpretation of the statute, *Nason v. INS*, 394 F.2d 223 (2d Cir.1968), was decided before *Chevron*. It further noted that it had "held, in post-*Chevron* cases, that the BIA is entitled to deference when interpreting other provisions of the Immigration and Nationality Act, as long as those interpretations are reasonable." 206 F.3d at 260. Judge Cabranes wrote separately to argue that the BIA interpretation of the relevant statute was entitled to deference and should be so recognized

formally. *Id.* at 266 (Cabranes, J., concurring). As for the Third Circuit, in 2017 that court "join[ed its] fellow Courts in concluding that the BIA's interpretation is reasonable." *Chavez-Alvarez*, 850 F.3d at 587. We alone remain.

### 2. *Reasonableness of BIA Interpretation*

Szonyi further argues that even if the BIA's interpretation is not foreclosed by circuit precedent, it is impermissible based on congressional intent and constitutional avoidance. As noted above, we already determined in *Wood* that the legislative history did not shed any light on Congress's intent regarding this provision. 266 F.2d at 828–29.

We are also unpersuaded by the arguments raised by Szonyi and amicus that the canon of constitutional avoidance requires a different interpretation. The Supreme Court's recent vagueness jurisprudence is distinguishable from the present case because those cases focused on the abstract nature of the residual clause inquiry. *See Johnson v. United States*, 135 S. Ct. 2551, 2557–58 (2015) (holding that a provision of the Armed Career Criminal Act was unconstitutionally vague because judicial assessment of risk was tied to "a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements" and "indeterminacy about how to measure the risk posed by a crime [was combined] with indeterminacy about how much risk it takes for the crime to qualify as a violent felony"); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1216 (2018) (striking down a similar provision because it "has the same '[t]wo features' that 'conspire[d] to make [ACCA's residual clause] unconstitutionally vague'" (alterations in original)). Because the "single scheme" exception is not tied to a judicially-imagined "ordinary case" and instead relies on a case-specific

determination, it does not present the same uncertainty concerns the Supreme Court identified in *Johnson* and *Dimaya*.

### 3.  *Retroactive Application of the BIA Standard*

Szonyi argues that even if the BIA approach is a permissible construction of the statute, the agency cannot retroactively apply that standard in this case. Under our test for retroactivity, we consider:

> (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

*Montgomery Ward & Co. v. FTC*, 691 F.2d 1322, 1333 (9th Cir. 1982). Applying this test, we conclude that the BIA's application of its standard to Szonyi's case was permissible.

We have recognized that the first factor "is not well suited for immigration rulings." *Acosta-Olivarria v. Lynch*, 799 F.3d 1271, 1275 (9th Cir. 2015). The parties agree that it is irrelevant here.

"The second and third factors are intertwined" and "will favor retroactivity if a party could reasonably have anticipated the change in the law such that the new requirement would not be a complete surprise." *Lemus v. Lynch*, 842 F.3d 641, 649 (9th Cir. 2016) (quotations omitted). Szonyi notes that at the time he pled guilty, courts in most jurisdictions applied a more expansive interpretation of "single scheme of criminal misconduct" than the one the BIA adopted in *Matter of Islam* and applied here. *See Matter of Adetiba*, 20 I. & N. Dec. at 510. As of then, however, the BIA itself had consistently applied its own narrower approach. It was not until 1992, a decade after Szonyi pled guilty, that the BIA announced that it would only apply its interpretation outside circuits, like the Ninth Circuit, that had adopted a more expansive interpretation. *Id.* at 511. Thus, at the time Szonyi pled guilty, it could reasonably have been anticipated that the BIA would apply its own interpretation. On balance, the second and third factors favor the government.

In immigration cases, we have held that "the fourth factor favors non-retroactive application because deportation is unquestionably a substantial burden." *Martinez-Cedillo v. Sessions*, 896 F.3d 979, 994 (2018). The government argues Szonyi would be removable even under the Ninth Circuit's single-scheme jurisprudence. But there is "a clear difference, for the purposes of retroactivity analysis, between facing possible deportation and facing certain deportation." *I.N.S. v. St. Cyr*, 533 U.S. 289, 325 (2001). Therefore, to the extent there was any uncertainty about Szonyi's removability under the Ninth Circuit standard but no such ambiguity under the BIA standard, the fourth factor favors Szonyi.

The fifth factor generally favors the government "because non-retroactivity impairs the uniformity of a statutory scheme, and the importance of uniformity in immigration law is well established." *Garfias-Rodriguez v. Holder*, 702 F.3d 504, 523 (9th Cir. 2012).

In sum, the second, third, and fifth factors favor retroactive application of the BIA interpretation, while the fourth factor favors Szonyi. On balance, we conclude that the retroactive application of the BIA's interpretation was not improper. *See Martinez-Cedillo*, 896 F.3d at 994 (holding retroactive application permissible based on the same balance of factors).

### 4. *The BIA's Application of Its Standard*

Szonyi further argues that even under BIA precedent he should not be removable. The BIA did not directly address the cases Szonyi has cited to us, probably because Szonyi did not raise them before the BIA, but it is not hard to infer the distinctions that the BIA presumably would have drawn. We conclude that the BIA's analysis was consistent with its precedent.

The BIA started its analysis by citing the interpretation of the relevant language set out in *Matter of Adetiba*, 20 I. & N. Dec. at 509–11. It then agreed with the IJ's finding that Szonyi's offenses against multiple victims over the course of six hours did not fall within a single scheme because, quoting from the IJ's decision, "the acts, though similar in character, [were] distinct, because the commission of one can occur without the commission of the other." The BIA also noted that the crimes did not constitute lesser included offenses of another crime and were not a natural consequence of a single

act of criminal misconduct. While the BIA noted that Szonyi's convictions covered conduct occurring on the same day in the same location, it observed "that the crimes occurred over a period of 6 hours did not deprive the respondent of an opportunity to reflect upon one crime before committing another." *Id*.

The BIA's conclusion was consistent with its statement in *Matter of Adetiba* that its prior cases had treated "single scheme" as "meaning there must be no substantial interruption that would allow the participant to disassociate himself from his enterprise and reflect on what he has done." 20 I. & N. Dec. at 509–10. The dissent concludes we cannot discern whether or how the BIA applied this standard. However, the BIA explicitly concluded that "[a]fter the abuse of any one victim, the respondent had the opportunity to cease his activities and reflect on what he had done." The dissent finds it significant that the BIA did not say there was a "substantial interruption" between the crimes, but the BIA has qualified that term as one that would allow the respondent to "reflect on what he has done." *Matter of Adetiba*, 20 I & N. Dec. at 509–10. The BIA found that Szonyi had such an opportunity here, and "[t]he BIA's factual findings are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Villavicencio v. Sessions*, 904 F.3d 658, 663–64 (9th Cir. 2018). We do not read the record as compelling a conclusion that Szonyi had no opportunity to reflect on his acts over a period of five or six hours while subjecting three separate women to nonconsensual sexual acts.

Szonyi argues that the BIA previously interpreted "single scheme" to include all crimes "performed in furtherance of a single criminal episode." He contends that all of his acts were

"in furtherance of a single criminal episode" that began when he pulled out a gun and continued for the next six hours as he performed nonconsensual sexual acts with multiple women. In quoting from BIA precedent, however, Szonyi omits the remainder of the relevant sentences, which clarify the meaning of "single criminal episode." Both *Matter of Islam* and *Matter of Adetiba* define "single scheme" as acts "performed in furtherance of a single criminal episode, such as where one crime constitutes a lesser offense of another or where two crimes flow from and are the natural consequence of a single act of criminal misconduct." *See Matter of Islam*, 25 I. & N. Dec. at 639; *Matter of Adetiba*, 20 I. & N. Dec. at 511. The BIA applied that standard here, describing "single criminal episode" as including "where one crime is a lesser included offense of another or two crimes 'flow from and are the natural consequence of a single act of criminal misconduct.'"

Szonyi also argues that the BIA's conclusion in this case is at odds with the discussion in other precedential BIA cases of what constitutes a "single scheme," including "convictions for indecent fondling of two minors in the same room at the same time," *see Matter of Z-*, 8 I. & N. Dec. 170, 175 (BIA 1958); situations where "A, B, & C are robbed by the alien at the same time," *see Matter of B-*, 8 I. & N. Dec. 236, 239 (BIA 1958); and convictions for assault with intent to do great bodily harm and manslaughter where the alien (1) pushed his mother-in-law down the stairs, then a few minutes later (2) stabbed his wife with a knife, *Matter of Pataki*, 15 I. & N. Dec. 324, 326 (BIA 1975). Szonyi argues that in light of these decisions, the BIA erred in treating as irrelevant the fact that Szonyi's convictions covered conduct occurring on the same day.

The BIA had previously made clear that the fact that multiple crimes occurred on the same day did not mean that they were necessarily part of a single scheme. *See, e.g.*, *Matter of D-*, 5 I. & N. Dec. 728, 729 (BIA 1954) ("The fact that one [crime] may follow the other closely, even immediately, in point of time is of no moment."). The cases Szonyi cited to us were all distinguishable based on their facts. For example, in *Matter of Pataki*, the BIA concluded that convictions for assault and manslaughter against separate victims constituted a "single scheme" because they "were committed within a few minutes of each other as the result of the same criminal impulse in the course of the same episode." 15 I. & N. Dec. at 325–26. As the Board described, the crimes occurred when, in a "rage, the [alien] pushed his mother-in-law down the stairs. The rage continued to the point that a few minutes later, he went for a knife and then stabbed his wife." *Id*. at 326. That two crimes committed within a few minutes of each other as part of one rage were held to fall within the same scheme does not mean that sexual crimes committed over a span of six hours against separate victims necessarily fell within a single scheme. Similarly, while both *Matter of Z-*, 8 I. & N. Dec. at 175, and *Matter of B-*, 8 I. & N. Dec. at 239, described acts occurring "at the same time" or "one time," the time period was not more specifically defined in either case. The BIA could have reasonably concluded those episodes were distinguishable from crimes committed over six hours.

Although the BIA did not specifically distinguish Szonyi's case from these other decisions, it is understandable that it did not do so where Szonyi failed to argue before the BIA that his case was comparable to those cases or to any of its precedents. The dissent concludes that Szonyi's brief to the BIA clearly placed the issue of substantial interruption

before the BIA by citing *Matter of Adetiba* and *Matter of Islam*, but the BIA also directly followed the tests laid out in those opinions to conclude that Szonyi's acts did not fall within a single scheme. The BIA should not be faulted for not distinguishing additional cases that Szonyi did not raise before the agency when he had the opportunity.

## III.    Discretionary Relief

Szonyi applied for two forms of discretionary relief: waiver of inadmissibility under former section 212(c) of the INA, 8 U.S.C. § 1182(c), and cancellation of removal under 8 U.S.C. § 1229b(a). This court lacks jurisdiction to review the merits of a discretionary decision to deny cancellation of removal, but it does have jurisdiction to review whether the IJ considered relevant evidence in making this decision. *Vilchez v. Holder*, 682 F.3d 1195, 1198 (9th Cir. 2012). "[T]he BIA abuses its discretion when it fails to consider all favorable and unfavorable factors bearing on a petitioner's application for § 212(c) relief." *Zheng v. Holder*, 644 F.3d 829, 833 (9th Cir. 2011).

Szonyi argues that the BIA failed to consider all favorable and unfavorable factors bearing on his eligibility for waiver of inadmissibility and cancellation of removal. In making this argument, Szonyi only looks to the BIA's reasoning, arguing that this court's review is limited to the BIA decision because the BIA conducted de novo review of the IJ's decision. Szonyi is correct that when the BIA reviews questions of discretion de novo under 8 C.F.R § 1003.1(d)(3)(ii), this court's review is limited to the BIA's decision, "except to the extent that the BIA expressly adopted the IJ's decision." *Vilchez*, 682 F.3d at 1199.

Here, the BIA announced it was conducting de novo review but also acknowledged "that the Immigration Judge adequately and correctly considered and addressed the respondent's equities and the adverse factors contained in the record." We may look to the IJ's decision when "the BIA incorporates parts of the IJ's reasoning as its own." *Aguilar-Ramos v. Holder*, 594 F.3d 701, 704 (9th Cir. 2010). This court has also reviewed the IJ's decision, and the BIA's opinion appeared to adopt the IJ's decision by giving examples from it. *See Morgan v. Mukasey*, 529 F.3d 1202, 1206 (9th Cir. 2008). The IJ expressly considered in her first decision and explicitly incorporated into her second decision the positive equities Szonyi claims the BIA erroneously failed to consider.

Even if the IJ's opinion were disregarded, this court generally presumes that the BIA thoroughly considers all relevant evidence in the record. *Larita-Martinez v. INS*, 220 F.3d 1092, 1095–96 (9th Cir. 2000); s*ee also Cole v. Holder*, 659 F.3d 762, 771 (9th Cir. 2011) ("When nothing in the record or the BIA's decision indicates a failure to consider all the evidence, a 'general statement that [the agency] considered all the evidence before [it]' may be sufficient." (citation omitted, alterations in original)). Here, the BIA generally recognized "positive equities in [Szonyi's] favor" and specifically recognized that these included his lengthy residence in the country, military service, steady employment, payment of taxes, charitable work, citizen sister, and various physical disabilities that require medical treatment. Given the general presumption that the BIA considered all relevant factors, the BIA did not abuse its discretion in denying relief.

## IV.     Conclusion

The petition for review is denied.

**PETITION FOR REVIEW DENIED.**

FISHER, Circuit Judge, dissenting:

I agree with much of the majority opinion but disagree with the majority's conclusion that the Board of Immigration Appeals (BIA) reasonably applied its precedent to this case. Maj. Op. 16–19.  BIA precedent squarely holds that two or more crimes committed during a single criminal episode arise from a single scheme of criminal conduct, and hence do not render an individual removable under 8 U.S.C. § 1227(a)(2)(A)(ii), unless they are marked by a "*substantial interruption* that would allow the participant to disassociate himself from his enterprise and reflect on what he has done" between crimes. *Matter of Adetiba*, 20 I. & N. Dec. 506, 509–10 (BIA 1992) (emphasis added).  Because we cannot discern whether or how the BIA applied this precedent in this case, where the petitioner's crimes were part of a single and continuous criminal episode, and there is nothing in the record to suggest there was a "substantial interruption" between the crimes, I would grant the petition for review and remand to the BIA for an adequate explanation. *See Eneh v. Holder*, 601 F.3d 943, 947–48 (9th Cir. 2010).  Although our review of BIA decisions is limited and deferential, we may not deny a petition for review where, as here, we are left to speculate as to the BIA's reasoning, and where we cannot discern from the record whether the BIA misapplied its own precedent. *See Alphonsus v. Holder*, 705 F.3d 1031, 1049

(9th Cir. 2013), *abrogation on other grounds recognized by Guerrero v. Whitaker*, 908 F.3d 541, 544 (9th Cir. 2018). I therefore respectfully dissent.

I

Istvan Szonyi was admitted to the United States, at the age of four or five, in 1957. In 1981, he was convicted of four criminal offenses involving two victims – two counts of unlawful oral copulation in violation of California Penal Code § 288a(c) and two counts of unlawful penetration in violation of California Penal Code § 289. He was sentenced to 12 years in prison, and released from prison in 1988.

The record tells us that Szonyi's offenses arose out of a single, continuous and horrific criminal episode: Szonyi invited three women into his nearby place of work, where he threatened, abused and degraded them over a period of five or six hours. The record does not, however, reveal when during this five or six hour period the four criminal offenses for which Szonyi was convicted occurred. Nor does it explain how much time elapsed between the offenses, or whether there was a substantial interruption between them.

In 2005, the Department of Homeland Security commenced removal proceedings against Szonyi. Relying on the 1981 convictions, the government charged Szonyi with being removable under 8 U.S.C. § 1227(a)(2)(A)(ii), which states:

> Any alien who at any time after admission is convicted of two or more crimes involving moral turpitude, *not arising out of a single scheme of criminal misconduct*, regardless of

> whether confined therefor and regardless of
> whether the convictions were in a single trial,
> is deportable.

8 U.S.C. § 1227(a)(2)(A)(ii) (emphasis added). The BIA
agreed with the government that Szonyi was removable
because he was convicted of multiple offenses of moral
turpitude "not arising from a single scheme." Szonyi timely
petitioned for review. The majority would deny the petition.
I would grant it.

## II

The term "arising out of a single scheme of criminal
misconduct" is not defined by the Immigration and
Nationality Act. The BIA, however, has defined the term in
a series of precedential decisions, holding that, "to be a
'single scheme,' the scheme must take place at one time,
meaning there must be no *substantial interruption* that would
allow the participant to disassociate himself from his
enterprise and reflect on what he has done." *Matter of
Adetiba*, 20 I. & N. Dec. at 509–10 (emphasis added); *accord
Matter of Islam*, 25 I. & N. Dec. 637, 640, 642 (BIA 2011).

In adopting this substantial interruption rule, the Board
followed the First Circuit's decision in *Pacheco v. INS*,
546 F.2d 448 (1st Cir. 1976). *See Matter of Adetiba*, 20 I. &
N. Dec. at 509–11. In *Pacheco*, the First Circuit held that
"the intent of Congress in [adopting the 'single scheme'
language] was to give 'a one-time alien offender . . . a second
chance before he could be deported.'" *Pacheco*, 546 F.2d at
451 (second alteration in original) (quoting *Nason v. INS*,
394 F.2d 223, 227 (2d Cir. 1968)). Thus, "a scheme, to be a
'single scheme', must take place at one time; there must be

no substantial interruption that would allow the participant to disassociate himself from his enterprise and reflect on what he has done." *Id.*  The court explained that "both the purpose of the statute and the use of the adjective 'single' point to a temporally integrated episode of continuous activity.  When the immediate activity has ended, even though a 'scheme' calls for future activity a participant has his second chance to make a decision." *Id.* at 452.

The Board also cited its own decision in *Matter of Pataki*, 15 I. & N. Dec. 324 (BIA 1975), as exemplifying the substantial interruption rule. *See Matter of Adetiba*, 20 I. & N. Dec. at 510.  In *Matter of Pataki*, 15 I. & N. Dec. at 325, the respondent pled guilty to two crimes occurring on the same day – an assault on his mother-in-law and a subsequent assault on his wife.  The BIA sustained the immigration judge's conclusion that the two crimes were part of a "single scheme of criminal misconduct":

> This evidence indicates that the crimes for which the respondent was convicted stem from a marriage problem.  In his rage, the respondent pushed his mother-in-law down the stairs. The rage continued to the point that a few minutes later, he went for a knife and then stabbed his wife.  We are satisfied that both crimes were committed within a few minutes of each other as the result of the same criminal impulse in the course of the same episode.  This evidence is probative of the existence of a single scheme.

*Id.* at 326.

Szonyi invoked the BIA's "substantial interruption" precedent here. Citing *Matter of Adetiba* and *Matter of Islam*, he correctly argued in his brief to the BIA that "for a course of criminal misconduct to constitute a single scheme it must take place at one time with no substantial interruption that would provide the perpetrator the opportunity to disassociate himself and reflect on the criminal enterprise." Administrative Record 11. He then argued that the criminal acts he committed constituted a "single scheme of criminal misconduct," because "there was no substantial interruption" that would have allowed him "to disassociate himself from his enterprise." *Id.* at 12–13.

The BIA did not meaningfully address this argument. To be sure, the Board said in a conclusory fashion that Szonyi had an opportunity between offenses to reflect on what he had done and to disassociate himself from the criminal enterprise:

> [T]hat the crimes occurred over a period of 6 hours did not deprive the respondent of an opportunity to reflect upon one crime before committing another. After the abuse of any one victim, the respondent had the opportunity to cease his activities and reflect on what he had done. Accordingly, the respondent was convicted of multiple offenses of moral turpitude not arising from a single scheme.

But the BIA did not provide any *basis* for concluding that Szonyi had an opportunity to reflect upon one crime before committing another. Significantly, the Board did not say that there was a substantial interruption between the crimes.

Our case law makes clear that the BIA must adequately explain its decisions. As we said in *Delgado v. Holder*, 648 F.3d 1095 (9th Cir. 2011) (en banc),

> the BIA must provide "a reasoned explanation for its actions." *Movsisian v. Ashcroft*, 395 F.3d 1095, 1098 (9th Cir. 2005). "Due process and this court's precedent require a minimum degree of clarity in dispositive reasoning and in the treatment of a properly raised argument." *Su Hwa She v. Holder*, 629 F.3d 958, 963 (9th Cir. 2010). The BIA must be clear enough that we need not "speculate based on an incomplete analysis." *Id.* at 964; *see also Eneh v. Holder*, 601 F.3d 943, 947 (9th Cir. 2010).

*Id.* at 1107.

The Board has not discharged that duty here. Did it conclude that a "substantial interruption" is not required? If so, how can it reconcile that conclusion with its decisions in *Matter of Adetiba* and *Matter of Islam*? *See Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1083 (9th Cir. 2013) (en banc) ("[W]e find that the BIA misapplied its own precedent . . . . Accordingly, we grant [the] petition for review and remand to the BIA for further proceedings."); *Israel v. INS*, 785 F.2d 738, 740 (9th Cir. 1986) ("The BIA acts arbitrarily when it disregards its own precedents and policies without giving a reasonable explanation for doing so."). Did it instead conclude that there *was* a "substantial interruption" in this case? If so, why didn't it say so, and what is the basis in the record for that conclusion?

The majority concludes that the substantial interruption requirement is satisfied in Szonyi's case because the crimes were "committed over a span of six hours." Maj. Op. 19. But this reasoning is unpersuasive. First, our review must be based on the BIA's reasoning, not our own. *See Andia v. Ashcroft*, 359 F.3d 1181, 1184 (9th Cir. 2004) ("If we conclude that the BIA's decision cannot be sustained upon its reasoning, we must remand to allow the agency to decide any issues remaining in the case."). Second, because the record does not reveal when during these five or six hours Szonyi's crimes of conviction occurred, it does not support the majority's conclusion that they were committed "over a span of six hours." They may have occurred within "a few minutes of each other," as in *Matter of Pataki*, 15 I. & N. Dec. at 326.[1] Third, even assuming arguendo that the crimes occurred over hours rather than minutes, the BIA has never held that a passage of time or the duration of a continuous criminal episode, without more, establishes a substantial interruption. As *Pacheco* makes clear, "a temporally integrated episode of continuous activity," as apparently occurred here, constitutes a single scheme, not two separate schemes. 546 F.2d at 452.[2]

---

[1] *See also Matter of B-*, 8 I. & N. Dec. 236, 239 (BIA 1958) (holding that a "single scheme" exists when "there are a series of similar acts which occurred at 'one time,'" as when "A & B are indecently fondled at the same time"); *Matter of Z-*, 8 I. & N. Dec. 170, 175 (BIA 1958) (explaining that "convictions for indecent fondling of two minors in the same room at the same time" are "so related in time and purpose as in reality to constitute" a single scheme).

[2] The BIA's decision in *Matter of Islam* provides an example of a case in which multiple crimes committed on a single day *were* marked by a substantial interruption. There, the respondent admitted that

The majority says the Board's failure to "distinguish Szonyi's case from . . . other decisions . . . is understandable" because "Szonyi failed to argue before the BIA that his case was comparable to those cases or to any of its precedents." Maj. Op. 19. Szonyi's brief to the BIA, however, cited the BIA's two key decisions on the substantial interruption issue – *Matter of Adetiba* and *Matter of Islam*[3] – and made the substantial interruption issue the centerpiece of his BIA appeal. *See* Administrative Record 11–13. It is, in fact, difficult to see what more Szonyi could have done to place the issue before the Board. It is true that Szonyi's brief before the BIA did not mention some other BIA decisions,

_____

> "on March 22, 2008, he used or attempted to use two different credit and debit cards belonging to another individual on five separate occasions to purchase goods." According to the Immigration Judge, the respondent "drove to four different locations and made five purchases over the span of a few hours." The locations where the cards were used were in two adjoining counties and involved different retail outlets, including Auto Zone and Walmart. During one transaction involving a stolen credit card, the respondent told the cashier that the card belonged to his girlfriend.

25 I. & N. Dec. at 638 (alteration omitted). The BIA held that "the respondent's crimes, while occurring in a single day, did not arise from a 'single scheme' of criminal misconduct," because, "[a]fter use of any one credit card, the respondent had the opportunity to disassociate himself from his enterprise and reflect on what he had done." *Id.* at 642 (alteration omitted). Here, by contrast, it is far from clear that there was a substantial interruption between Szonyi's offenses.

[3] *Matter of Adetiba*, in turn, cited *Matter of Pataki* as exemplifying the substantial interruption rule. *See Matter of Adetiba*, 20 I. & N. Dec. at 510.

such as the two decisions discussed above in footnote 1. But this is of no moment. Szonyi squarely presented the substantial interruption issue to the Board. The BIA, therefore, was bound to address the issue in a manner that would allow for meaningful appellate review.

The majority alternatively suggests we can uphold the BIA's decision by relying on the deferential standard of review we apply to the BIA's findings of fact. The majority notes that the BIA found Szonyi "had the opportunity to cease his activities and reflect on what he has done," and argues that the record does not compel "a conclusion that Szonyi had no opportunity to reflect on his acts over a period of five or six hours while subjecting three separate women to nonconsensual sexual acts." Maj. Op. 17. I cannot agree.

*First*, the issue in this case is whether Szonyi had an opportunity to reflect between the *actual crimes* for which he was *convicted*. 8 U.S.C. § 1227(a)(2)(A)(ii). Szonyi was not convicted of assaulting three women, and he was not convicted of engaging in assaults over a period of five or six hours. He was convicted of four unlawful acts involving two women, and the record is silent as to when those acts occurred in relation to one another. *Second*, although we have a duty to defer to the Board's findings of fact, we do not defer to mere speculation. *See Maini v. INS*, 212 F.3d 1167, 1175 (9th Cir. 2000) ("We have said it before and we say it again: conjecture and speculation can never replace substantial evidence."). Here, there is nothing in the record to show that any time elapsed between the actual crimes for which Szonyi was convicted. Hence, *if* the BIA relied on the theory that *time elapsed* between Szonyi's crimes, then the BIA relied on speculation, and its finding is not supported by substantial evidence. If the BIA alternatively relied on the

theory that *no time lapse was required*, then the BIA needed to reconcile that conclusion with its own precedent. *See Matter of Adetiba*, 20 I. & N. Dec. at 509–10 (holding that there must be a "substantial interruption that would allow the participant to disassociate himself from his enterprise and reflect on what he has done"); *Matter of Islam*, 25 I. & N. Dec. at 640, 642 (same); *Matter of Pataki*, 15 I. & N. Dec. at 326 (holding that two distinct crimes involving different victims, committed within a few minutes of each, resulting from the same criminal impulse and committed in the course of the same episode arose out of a "single scheme of criminal misconduct"); *Matter of B-*, 8 I. & N. Dec. at 239 (holding that a "single scheme" exists when "there are a series of similar acts which occurred at 'one time," as when "A & B are indecently fondled at the same time"); *Matter of Z-*, 8 I. & N. Dec. at 175 (same). The standard of review offers no shelter here.

## III

On this record, I would grant the petition for review and remand for the BIA to adequately explain its decision. BIA precedent clearly requires a "substantial interruption" between offenses, and Szonyi squarely placed this issue before the BIA. The BIA, however, did not address it, leaving us to speculate whether the BIA disregarded the "substantial interruption" requirement, in contravention of its own precedent, or concluded that there was a "substantial interruption" between offenses in this case, but without saying so and without pointing to anything in the record to support that conclusion. Absent an adequate explanation, we cannot effectively review the Board's decision.